<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                        )
ACRA TURF CLUB, LLC et al.              )
                                        )
                Plaintiffs,             )
                                        )
v.                                      )        Civil Action No. 12-2775 (JAP)
                                        )
FRANCESCO ZANZUCCKI                     )        **MEMORANDUM OPINION**
                                        )
                Defendant.              )
_____ )

**PISANO, Judge**

This matter comes before the Court upon a Motion for Preliminary Injunction by

Plaintiffs ACRA Turf Club, LLC and Freehold Raceway Off Track, LLC (collectively

"Plaintiffs").  (DE 6.)  Defendant Francesco Zanzuccki ("Defendant") opposes the Motion.  (DE

9.)  The Court has considered the parties' submissions and held oral argument on June 18, 2012.

For the reasons set forth below, the Court will deny the Motion for a Preliminary Injunction

without prejudice.


**I.      BACKGROUND**

    **A.      Off-Track and Account Wagering Act**

This case involves New Jersey's Off-Track and Account Wagering Act ("the Act") and

several recent amendments made to the Act.  Approved on February 1, 2002, the Act authorizes

the establishment of off-track wagering facilities where patrons can bet on live horse races

(hereinafter "wagering facilities").  <u>See</u> N.J. Stat. Ann. 5-5:127.  The declared purpose of the

Act, among other things, is "to promote the economic future of the horse racing industry in this

State, to foster the potential for increased commerce, employment and recreational opportunities in this State and to preserve the State's open spaces."  N.J. Stat. Ann. 5:5-128b.

To open and operate a wagering facility, the New Jersey Sports and Exposition Authority ("NJSEA") must apply for and receive a license from the New Jersey Horse Racing Commission ("Commission").  See N.J. Stat. Ann. 5:5-130.  But the Act places several restrictions on the licensing and operation of wagering facilities.  First, the Act caps the total number of licensed wagering facilities at fifteen.  See N.J. Stat. Ann. 5:5-136a.  In addition, no more than eight wagering facilities are allowed to be licensed in the first two years after the effective date of the Act.  Id. at 5:5-136b.

The Act also limits to whom NJSEA may transfer licenses.  See N.J. Stat. Ann. 5-5:130a. NJSEA may issue licenses only to entities that (1) held a valid permit to hold or conduct a race horse meeting within the State in the calendar year 2000; (2) [have] complied with the terms of such permit; and (3) [are] in good standing with the [C]ommission and State of New Jersey.  See N.J. Stat. Ann. 5-5:130a.  The Legislature declared that "[i]n establishing off-track wagering facilities," however, NJSEA "will not be performing an essential government function but rather an essentially private business function."  N.J. Stat. Ann. 5-5:128e.

Before NJSEA may issue licenses to eligible permit holders, it must enter into a "participation agreement" with those permit holders.  See N.J. Stat. Ann. 5:5-130a.  A participation agreement is defined by the Act as a "written contract" that provides for "the manner in which the off-track wagering facility or facilities . . . shall be managed, operated and capitalized, as well as how expenses and revenues shall be allocated and distributed by and among [NJSEA] and the other eligible participants."  N.J. Stat. Ann. 5:5-129.  The participation

2

agreement is required by the Act and must be approved by both the Commission and the New

Jersey Attorney General.  <u>See</u> N.J. Stat. Ann. 5:5-130b.

> **B.      The Parties' Participation Agreement**

When the Act was passed in 2002, Plaintiffs ACRA Turf Club, LLC ("ACRA") and

Freehold Raceway Off Track, LLC ("Freehold Raceway") were the only two permit holders that

satisfied the Act's participation requirements.  Accordingly, ACRA, Freehold Raceway, and

NJSEA signed the Master Off Track Wagering Participation Agreement (hereinafter

"Participation Agreement") on September 8, 2003. (Verified Compl., Ex. A; DE 1-1 ("Ex. A").)

It was amended on February 6, 2004.  (<u>Id.</u> at Ex. B.)

The Participation Agreement, having a term of 40 years, divides the fifteen wagering

facility licenses among the parties: NJSEA is entitled to nine licenses, ACRA is entitled to two

licenses, and Freehold Raceway is entitled to four licenses.  (Ex. A, § 1.1.)  In exchange for this

"fair and equitable" share of licenses, each party agreed to waive all rights to the other licenses.

(<u>Id.</u>)  The parties contemplated that additional licenses, beyond the fifteen permitted by the Act,

may eventually be authorized, and the Participation Agreement divides those among the parties

as well.  (<u>Id.</u> § 4.4.)

Each party also was given exclusive control over designated geographic areas near their

respective racetracks.  (<u>Id.</u> § 2.1.)  For example, ACRA was given geographic exclusivity in

Cumberland County, Cape May County, Salem County, and Atlantic County (with the exception

of Atlantic City) so that ACRA's two wagering facilities could be located near Atlantic City

Race Course.  (<u>Id.</u> § 1.2(i).)

NJSEA agreed to assign to ACRA and Freehold Raceway "full ownership, economic and

operational rights" in the wagering facilities.  (<u>Id.</u> § 1.1.)  With respect to opening wagering

facilities, ACRA and Freehold Raceway are entitled "to determine the timing and order of the application(s) for each respective initial" license.[1]  (Id. § 1.2(b).)  In addition, the parties may transfer the ownership, economic, and operation interests in their wagering facilities and licenses to a permit holder that meets the participation requirements of the Act.  (Id. § 3.1.)

As required by the Act, the Commission and Attorney General reviewed the Participation Agreement.  The Commission entered an Order on February 23, 2004 approving the Participation Agreement.  (Verified Compl., Ex. E; DE 1-1.)  Likewise, the New Jersey Attorney General approved the Participation Agreement by letter dated March 10, 2004.  (Id. at Ex. F.)

### C.     Amendments to the Off-Track and Account Wagering Act

There are three wagering facilities open in New Jersey: Favorites at Vineland, owned by ACRA; Favorites at Toms River, owned by Freehold Raceway; and Favorites at Woodbridge, owned by NJSEA.[2]  (Verified Compl. ¶ 46.)  Both ACRA and Freehold Raceway insist that they are making progress toward establishing their remaining wagering facilities.  (Id. ¶¶ 48, 49.)

The New Jersey Legislature, however, was frustrated with "the glacial pace" at which ACRA, Freehold Raceway, and NJSEA were opening their wagering facilities.  (Def. Br. at 22; DE 9.)  To that end, the Legislature enacted what Defendant calls "economic incentives" in order to "encourage" Plaintiffs and NJSEA to promptly license and open the remaining wagering facilities.  (Id. at 1, 31.)

---

[1] The Act provides that NJSEA will submit the application for the initial license, which is valid for one year.  See N.J. Stat. Ann. 130a.  The Act authorizes the Commission to establish regulations for the procedure and conditions for renewal of licenses.  See N.J. Stat. Ann. 5:5-131c.

[2] The name "Favorites" is the result of a common marketing and branding strategy required by the Participation Agreement. (Ex A, § 4.2).

### 1.      The Forfeiture Amendment

The Legislature first amended the Act on February 23, 2011 to set a date by which permit holders subject to a participation agreement (i.e., ACRA, Freehold Raceway, and NJSEA) must establish all remaining wagering facilities.  See 2011 N.J. Laws 26, 2011 P.L. ch. 26.  This amendment (hereinafter "Forfeiture Amendment") provides that "any facility that has not received a license . . . by January 1, 2012 shall no longer be considered as part of the permit holder's share[.]"  Id. § 3.

The Commission may, however, allow a permit holder to keep its share of licenses if the permit holder demonstrates that it is "making progress toward obtaining an off-track wagering license and establishing an off-track wagering facility . . . ."  Id.  The Forfeiture Amendment states that progress towards opening a wagering facility should be evaluated "according to specified benchmarks developed by the [C]ommission."  Id.  But after the New Jersey Governor conditionally vetoed the Forfeiture Amendment, specific considerations to be made by the Commission were added.  Namely, a permit holder is making progress if it has entered into an agreement to transfer its share of wagering facility licenses in connection with negotiations over the sale or lease of a racetrack under its control, or if such an agreement is imminent.  Id.

### 2.      The Deposit Amendment

The next amendment, approved on January 17, 2012, extends the forfeiture date from January 1, 2012 to June 28, 2012 (hereinafter "Deposit Amendment").  See 2011 N.J. Laws 205, 2011 P.L. ch. 205, § 2.  The Deposit Amendment then provides that "any [wagering] facility that has not received a license" by December 31, 2011 "shall be subject to a cash deposit, bond, or an irrevocable letter of credit to be posted or deposited in the amount of $1 million for each facility in the permit holder's share that remains to be licensed, which deposit shall be paid to the

[C]ommission" on June 28, 2012.  Id. § 1.  A permit holder has the same ability to demonstrate

progress in opening its share of wagering facilities under the Deposit Amendment as is provided

by the Forfeiture Amendment.[3]  Id.  If successful, a permit holder is absolved of the need to pay

the $1 million deposit for each un-opened wagering facility.  Id.  Should a permit holder fail to

pay the $1 million deposit, it forfeits the license needed to open a wagering facility, and the

license becomes available to a "horsemen's organization."[4]  Id.

The $1 million deposit is returned if, in the year after the deposit, the permit holder

makes "substantial progress" towards establishing the wagering facility.  Id.  If the permit holder

fails to make substantial progress, its license is forfeited.  Id.  In that case, the Commission gives

both the forfeited license and the $1 million deposit to a horsemen's organization, who may then

undertake to establish the wagering facility.  Id.  If a horsemen's organization fails to open the

wagering facility within a year's time, then the license is made available through a bidding

process to a "well-suited entity," and any $1 million deposits are returned to the permit holder

"to be used for capital improvements at the permit holder's racetrack."  Id.

### 3.     The Pilot Program Act

The Legislature last amended the Act to create a Pilot Program (hereinafter "Pilot

Program Act").  See 2011 N.J. Laws 228, 2011 P.L. ch. 228.  Under the Pilot Program Act, the

---

[3] The Deposit Amendment retains the lease or sale, or imminent lease or sale benchmarks
found in the Forfeiture Amendment, and adds a third benchmark: a permit holder may
demonstrate that, despite unsuccessful negotiations regarding the sale or lease of a racetrack, the
permit holder has plans to begin new negotiations that have a reasonable likelihood of success.
See 2011 N.J. Laws 205, § 1.

[4] A "horsemen's organization" is defined by the Simulcasting Racing Act as "the
Horsemen's Benevolent and Protective Association, the Standardbred Breeders' and Owners'
Association, or another organization or group representing a majority of horsemen engaged in
competing for purses during a regularly scheduled horse race meeting, as the case may be."  N.J.
Stat. Ann. 5:5-11a.

6

Commission must issue a one-year, renewable license to "a lessee or purchaser of a State-owned racetrack to provide patrons with the ability to place wagers on horse races through electronic wagering terminals to be located at a limited number of eligible taverns, restaurants, and similar venues . . . ." Id. §§ 1, 1a.

But the Pilot Program Act does not create a new, sixteenth license.  Instead, the Pilot Program license is "[i]n lieu of a maximum of one off-track wagering facility license that remains" unused by the NJSEA.  Id. § 1a.  With the Pilot Program license, the lessee or purchaser of a State-owned racetrack may install twenty electronic wagering terminals in not more than twelve qualified locations in the northern part of New Jersey.  Id. §§ 1a, 1b.  The Pilot Program Act further provides that the license-holder is subject to all the conditions of a participation agreement.  Id. § 1b.

### D.     Plaintiffs' Progress Petitions and Verified Complaint

Pursuant to the Forfeiture and Deposit Amendments, ACRA and Freehold Raceway submitted petitions to the Commission in order to demonstrate that they are making progress toward establishing their share of wagering facilities.  (Def. Br. at 9.)  On June 20, 2012, the Commission approved Plaintiffs' progress petitions, and therefore, at least for this year, Plaintiffs do not forfeit their licenses and do not need to post deposits.  (Def. 6/22/12 Letter at 1; DE 20.)

In order for the Commission's decision to have force and effect, a certified copy of the Commission's minutes must be delivered to the Governor for approval.  See N.J. Stat. Ann. 5:5-22.1.  The Commission's certified minutes were submitted to the Governor, and he approved the Commission's action on June 25, 2012.  (Def. 6/28/12 Letter, Exs. A and B; DE 30-1.)  Counsel for Defendant, Assistant Attorney General Stuart Feinblatt, stated that given the Commission's rulings and the Governor's approval, the "Forfeiture and Deposit Amendments that are being

7

challenged by plaintiffs will not be enforced by the Commission at this time."  (Def. 6/25/12 Letter at 1-2; DE 25.)  It is not until a year from now that Plaintiffs will need to make another showing of progress before the Commission.  See 2011 N.J. Laws 26, § 3; 2011 N.J. Laws 205, § 2.

Plaintiffs filed their Verified Complaint on May 9, 2012 alleging violations of the Contract Clause, Takings Clause, Due Process Clause, and Equal Protection Clause of the United States Constitution and the equivalent provisions of the New Jersey Constitution.  (See Verified Compl.; DE 1.)  On May 24, 2012, Plaintiffs filed a Motion for Preliminary Injunction seeking to enjoin the enforcement of the Forfeiture Amendment, Deposit Amendment, and Pilot Program Act pending a final determination of the action.  (DE 6.)  Defendant opposes the Motion.  (DE 9.)  The Court held oral argument on June 18, 2012.


## II.    JURISDICTION

Federal courts have limited subject matter jurisdiction and possess "only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto."  Bender v. Williamsport Area School Dist., 475 U.S. 534, 541 (1986).  Article III limits this Court's jurisdiction to actual "cases" and "controversies."  U.S. Const. art. III, § 2.  "To satisfy Article III's 'case or controversy' requirement, an action must present '(1) a legal controversy that is real and not hypothetical, (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicate for reasoned adjudication, and (3) a legal controversy so as to sharpen the issues for judicial resolution.'"  Armstrong World Indus., Inc. v. Adams, 961 F.2d 405, 410 (3d Cir. 1992) (quoting Int'l Brotherhood of Boilermakers v. Kelly, 815 F.2d 912, 915 (3d Cir. 1987)).

Because a "live" case or controversy is required, a cause of action must fulfill the ripeness requirement, which "determines when a proper party may bring an action." Philadelphia Fed'n of Teachers v. Ridge, 150 F.3d 319, 322-23 (3d Cir. 1998) (internal quotations omitted). The doctrine "serves to determine whether a party has brought an action prematurely," County Concrete Corp. v. Town of Roxbury, 442 F.3d 159, 164 (3d Cir. 2006), and "prevent[s] federal courts, through premature adjudication, from entangling themselves in abstract disagreements," Wyatt v. Virgin Islands, 385 F.3d 801, 806 (3d Cir. 2004).

There are two factors in making a ripeness determination: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Labs. v. Gardener, 387 U.S. 136, 149 (1967); see also Texas v. United States, 523 U.S. 296, 300-01 (1998). The Third Circuit has set forth several considerations applicable in the context of forward-looking injunctions: the "adversity of the parties' interests," the "probable conclusiveness of a judgment," and "the practical utility to the parties of rendering a judgment." NE Hub Partners, L.P. v. CNG Transmission Corp., 239 F.3d 333, 342 (3d Cir. 2001) (citing Step-Saver Data Sys. Inc. v. Wyse Tech., 912 F.2d 643, 647 (3d Cir. 1990)).

First, in determining the adversity of the parties' interests, the court need not find that a plaintiff has suffered a completed harm. See Armstrong, 961 F.2d at 412 (citing Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 201 (1983). Here, the Commission approved Plaintiffs' progress petitions and therefore Plaintiffs will not pay $1 million deposits or forfeit their wagering facility licenses this year. In view of the Commission's action, Defendant maintains that the Forfeiture and Deposit Amendments are not being enforced. But that is not entirely accurate. By requiring Plaintiffs to petition in the first place, Defendant has already enforced the Forfeiture and Deposit Amendments in that, if

Plaintiffs did not submit progress petitions, they would have needed to post deposits or otherwise forfeit their wagering facility licenses.  And, if Plaintiffs do not make progress according to the timeline set by the Commission, Defendant will require Plaintiffs to pay deposits or forfeit their rights under the Participation Agreement.  "In this circumstance, compliance is coerced by the threat of enforcement, and the controversy is both immediate and real."  Lake Carriers' Ass'n v. Macmullan, 406 U.S. 498, 508 (1972).

Next, "any contest must be based on a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."  Step-Saver, 912 F.2d at 649 (quotation omitted).  Here, the amendments to the Act have an immediate impact on Plaintiffs, and there is little need for further factual development.  See Atlanta Gas Light Co. v. U.S. Dep't of Energy, 666 F.2d 1359, 1364 n. 7 (11th Cir. 1982) ("[T]he [constitutional] challenge is unlikely to change in substance or in clarity by virtue of an actual prosecution.  Thus another of the values inherent in the ripeness doctrine, namely, the need for a concrete presentation of the issues, would not be served by awaiting enforcement.").  Even disregarding the forfeiture and deposit requirements, the amendments to the Act have an immediate effect on Plaintiffs by directing them to continue to make progress in establishing their wagering facilities.  Cf. Armstrong, 961 F.2d at 421 (finding an action not ripe in part because the challenged act had no present impact on the plaintiffs); see also Pacific Gas & Electric Co., 461 U.S. at 201-02 (finding a claim ripe where the parties would otherwise be forced to proceed with substantial construction expenditures without knowing whether the challenged act was constitutional).  Further still, the amendments to the Act were aimed at Plaintiffs specifically, such that they "are now, and will in the future be the most appropriate parties to raise the [constitutional] objection[s]."  Atlanta Gas

Light Co., 666 F.2d at 1364 n. 7.  Therefore, any judgment rendered in this action will be conclusive of the claims raised.

Finally, adjudication of this action will have an effect on the "parties' plans of action." Step-Saver, 912 F.2d at 649 n. 9.  The "utility" factor weighs against finding a claim ripe where the tangible benefit of a judgment is conjectural.  See Armstrong, 961 F.2d 423.  That is not the case here because a judgment would change Plaintiffs' course of conduct immediately.  Plaintiffs would no longer need to attempt to open multiple wagering facilities in the next year.  In addition, the electronic terminals authorized by the Pilot Program Act affect where Plaintiffs build their wagering facilities because the electronic terminals dilute Plaintiffs' exclusive geographic and market share.  Therefore, adjudication of Plaintiffs' claims will be practically useful.

The Court, in sum, finds this action ripe.  Plaintiffs are faced with two choices: relinquish what they believe to be their contractual rights to comply with the Commission's progress requirement or risk the loss of their rights forever.  Defendant has therefore, in effect, compelled Plaintiffs to comply with the Forfeiture and Deposit Amendments but then used their compliance as grounds to deny constitutional review.  Presented with this scenario, the Court finds that this action is fit for judicial review, and Plaintiffs would suffer hardship if the Court were to deny them consideration of their constitutional claims.

## III.    LEGAL STANDARD

Plaintiffs seek a preliminary injunction enjoining the enforcement of the Forfeiture Amendment, the Deposit Amendment, and the Pilot Program Act.  In evaluating a motion for preliminary injunctive relief, a court must consider whether: "(1) the plaintiff is likely to succeed

on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest." NutraSweet Co. v. Vit-Mart Enter., Inc., 176 F.3d 151, 153 (3d Cir. 1999) (quoting Maldonado v. Houstoun, 157 F.3d 179, 184 (3d Cir. 1998)).

A preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997). Preliminary injunctive relief is an extraordinary remedy, which "should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." American Tel. and Tel. Co. v. Winback and Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994). "The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate." P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC, 428 F.3d 504, 508 (3d Cir. 2005).

## IV.   ANALYSIS

### A.   Likelihood of Success on the Merits

#### 1.   Contract Clause

The Contract Clause provides "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. In determining whether there has been a violation of the Contract Clause, the threshold inquiry is whether the change in State law has "operated as a substantial impairment of a contractual relationship." Gen. Motors Corp. v. Romein, 503 U.S. 181, 186 (1992) (citations omitted); N.J. Retail Merch's Ass'n v. Sidamon-Eristoff, 669 F.3d 374, 386 (3d Cir. 2012). If the threshold inquiry is satisfied, the court then determines whether the State law "has a legitimate and important public purpose." Transport

Workers Union of Am., Local 290 v. S.E. Pa. Transp. Auth., 145 F.3d 619, 621 (3d Cir. 1998). If so, the court "must ascertain whether the adjustment of the rights of the parties to the contractual relationship was reasonable and appropriate in light of that purpose." N.J. Retail Merch's Ass'n, 669 F.3d at 386.

The Court agrees with Plaintiffs that there are problems with the amendments to the Off-Track and Account Wagering Act. The Verified Complaint sets forth credible facts making up a colorable claim that the Forfeiture and Deposit Amendments effect violations of the Contract Clause. However, as of June 25, 2012, the Commission has chosen not to enforce those amendments for at least the next year. On the other hand, the Pilot Program will go into effect this year, and as explained below, Plaintiffs have also demonstrated a plausible claim that the Pilot Program Act violates the Contract Clause.

> **a.  Substantial Impairment of the Contractual Relationship**

The first question in determining if there is a Contract Clause violation is whether there is a substantial impairment of the contract, and to answer that question, the Court must consider the expectations of the contracting parties. See N.J. Retail Merch's Ass'n, 669 F.3d at 386. Here, Plaintiffs legitimately expected to have, and indeed received, full ownership and control over their wagering facility licenses for 40 years. NJSEA assigned to Plaintiffs "full ownership, economic and operational rights" in the wagering facilities. (Ex. A, § 1.1, ¶2; see also id. at §§ 1.2(d), 1.3(a).)

In association with their ownership rights, Plaintiffs expected and received "full and exclusive management authority, discretion and oversight with regard to the ownership and operation of each" wagering facility. (Id. § 1.3(a)(ii).) The unlimited discretion granted to Plaintiffs in this regard extends to the timing of the establishment of wagering facilities:

> With regard to each of the Participant Off Track Facilities, each
> respective Participant [Plaintiff] shall be entitled, subject to
> the provisions of this Agreement, to determine the timing and order of
> the application(s) for each respective initial Off Track License for
> a Participant [Wagering Facility], without the consent or approval
> of the [NJSEA] or any other Participant, except as otherwise
> provided herein.

(Id. § 1.2(b).)  For that reason, the Plaintiffs expected that the time frame for establishing their

share of wagering facilities was entirely left up to them, and reliance on that expectation was

justified because both the Commission and Attorney General approved the Participation

Agreement.

In addition, given the Act's maximum number of authorized licenses, Plaintiffs expected

that only fifteen wagering facilities would be established.  Even so, Plaintiffs prepared for a

situation in which the Legislature authorized additional licenses, and the Participation Agreement

specifically allocates any additional licenses proportionately.  The Participation Agreement

thereby predetermined each party's market share in the event that the Legislature authorized

additional licenses.

After identifying a plaintiff's legitimate expectations, a court then determines "whether

the modification imposes an obligation or liability that was unexpected at the time the parties

entered into the contract and relied on its terms."  Id. (citing U.S. Trust Co. of New York v. New

Jersey, 431 U.S. 1, 19 n.17 (1977)).  When the Legislature enacted the Off-Track and Account

Wagering Act, it limited the State's involvement with respect to the establishment and operation

of wagering facilities.  In particular, the Legislature left it to NJSEA to negotiate "the manner in

which the off-track wagering facility or facilities . . . shall be managed, operated and

capitalized."  N.J. Stat. Ann. 5:5-130 (defining the scope of the mandatory participation

agreement).  Moreover, the Legislature did not establish a minimum number of wagering

14

facilities that must be opened, and it did not require the wagering facilities to be opened within a set time period.

As a consequence, Plaintiffs could not have anticipated that the Legislature would reverse its position on who may control the operation and management of wagering facilities and how the licenses would be allocated.  But the Legislature did so in several ways.

First, the Deposit Amendment requires Plaintiffs to post an onerous $1 million deposit just to keep the rights granted to them by the Participation Agreement.  Given the 40 year term of the Participation Agreement, Plaintiffs could not have expected to lose their share of wagering facility licenses any sooner.  Nor could Plaintiffs anticipate the need to pay what amounts to additional consideration in order to keep their bargained-for rights eight years after signing the Participation Agreement.  See Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 245 (1978) ("Contracts enable individuals to order their personal and business affairs according to their particular needs and interests.  Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them.").

Second, the Forfeiture Amendment expressly requires Plaintiffs to have established all of their wagering facilities by January 1, 2012 or forever lose the rights in those wagering facilities. The dire and permanent consequences for failing to meet the deadline are in direct conflict with the full operational and managerial authority granted to Plaintiffs for 40 years by the Participation Agreement.

Third, the Pilot Program Act altered the way in which additional licenses were to be distributed.  While the Pilot Program Act does not add an additional license, it allows the lessee or purchaser of a State-owned racetrack to establish, in effect, five additional wagering locations in the northern part of New Jersey.  This not only adds a necessary party to the Participation

Agreement, but it alters the share of the off-track wagering market that Plaintiffs expected to have.

### b.      Whether the Legislation Has a Legitimate Public Purpose

The next inquiry in the Contract Clause analysis is whether the legislation has a legitimate public purpose.  See Nieves v. Hess Oil Virgin Islands Corp., 819 F.2d 1237, 1248 (3d Cir. 1987) (internal citation omitted).  "Courts are required to defer to the legislature's judgment concerning the necessity and reasonableness of economic and social legislation."  Id. at 1249.  For example, the Supreme Court has upheld state laws that impair contracts but are passed pursuant to the state's police powers.  See, e.g., Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398 (1934); Keystone Bituminous Coal Ass'n v. DeBenedictis 480 U.S. 470 (1987).

In this case, the Legislature stated that "[t]he horse racing industry is economically important to this State, and the general welfare of the people of the State will be promoted by the advancement of horse racing and related projects and facilities in the State."  N.J. Stat. Ann. 5:5-128a.  The Legislature more narrowly explained the purpose of the wagering facilities.  "In establishing off-track wagering facilities, the [NJSEA] will not be performing an essential government function but rather an essentially private business function."  N.J. Stat. Ann 5:5-128e.  Nevertheless, the wagering facilities are an important component of New Jersey's horse racing industry because they increase the size of purses, improve the quality of the horses and races, and increase overall interest in horse racing, thereby financially benefiting the industry as a whole.

        **c.**      **Whether the Adjustment of the Rights of the Parties to the Contractual Relationship Was Reasonable and Appropriate**

The final inquiry is "whether the adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." <u>Nieves</u>, 819 F.2d at 1243 (internal citations and quotations omitted).

The Court recognizes that the New Jersey horse racing industry, a decade after the Act was passed, is facing new challenges due in large part to the economic instability of the New Jersey horsemen's organizations. The horsemen's organizations are composed of the Thoroughbred and Standardbred owners and trainers, and therefore their existence is necessary to keep the entire New Jersey horse racing industry afloat. Accordingly, the State decided to lease Meadowlands Racetrack and Monmouth Park to the horseman's organizations in order to begin to create a self-sustaining horse racing industry. (<u>See</u> Governor's Conditional Veto, Verified Compl., Ex. L, DE 1-2.) In connection with negotiating the lease agreements, the State wanted to be able to provide economic incentives to the horsemen's organization, including the prospect of income from off-track wagering facilities and additional Pilot Program electric wagering terminals. (<u>Id.</u>) Thus, faced with this reality and the desire to rescue New Jersey's storied horse racing industry, the Legislature took those steps it thought appropriate.

Yet, in doing so, the Legislature introduced an unforeseen competitor into the off-track wagering market despite having already defined and limited the market participants when it passed the Act and approved the Participation Agreement. Indeed, Defendant appears to recognize that the Forfeiture and Deposit requirements pose constitutional problems, and the Commission is no longer enforcing those requirements. By approving Plaintiffs' progress

petitions, the Commission has delayed any forfeiture and deposit for at least a year.  And, if the Commission continues to find Plaintiffs are making progress, Plaintiffs will never have to post a deposit or forfeit their licenses.  Despite Defendant's reassurances, however, the Court observes that the Commission has wide discretion in determining whether Plaintiffs are continuing to make progress.  In effect, Defendant compelled Plaintiffs to comply with the making-progress provisions of the Forfeiture and Deposit Amendments and then used Plaintiffs' progress as reason to postpone constitutional review, all the while retaining the broad authority to reinstate the problematic amendments each year.  Cf. Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 507-508 (1972).

Furthermore, even if Plaintiffs continue to make progress in opening their wagering facilities, the Pilot Program Act will go into effect and dilute the market share Plaintiffs received in the Participation Agreement.  Therefore, although the Commission will not enforce the Forfeiture and Deposit Amendments, the Court finds Plaintiffs have demonstrated that the Pilot Program Act by itself may not pass scrutiny under the Contract Clause.

### 2.        Fifth Amendment Takings Clause

Plaintiffs next assert that the amendments to the Act violate the Fifth Amendment "Takings Clause."  The Takings Clause, which is made applicable to the States through the Fourteenth Amendment, see Chicago, Burlington, and Quincy R.R. Co. v. Chicago, 166 U.S. 226 (1897), provides that "private property [shall not] be taken for public use, without just compensation."  U.S. Const., Amend. V.  In determining whether there is an unconstitutional taking, a court asks (1) whether the plaintiff has a property interest protected by the Fifth Amendment's Takings Clause; (2) if so, whether the government's action constitutes a taking of that property; (3) whether the taking is for a public use; and (4) if there is a taking for public use,

whether the plaintiff is justly compensated.  See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1000-01 (1984).

On its face, the Verified Complaint presents a colorable claim under the Takings Clause. Plaintiffs have a recognized property interest in their wagering facility licenses, which were granted to them for 40 years as set forth Participation Agreement.  See Lynch v. United States, 292 U.S. 571, 579 (1934) ("Valid contracts are property, whether the obligor be a private individual, a municipality, a State or the United States.").

Plaintiffs have also demonstrated the likelihood that the amendments, if enforced, constitute a taking.  "Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking."  Ruckelshaus, 467 U.S. at 1005 (quoting United States v. General Motors corp., 323 U.S. 373, 378 (1945)).  If Plaintiffs do not meet the requirements of the Forfeiture and Deposit Amendments, Plaintiffs lose their wagering facility rights forever, without compensation, and those rights are given first to a horseman's organization or second to a well-suited entity.

It is unlikely, however, that the Plaintiffs can demonstrate that the taking is not for a public use.  The public benefits from the prompt establishment of the remaining wagering facilities, even if the wagering facility is "essentially a private business function."  N.J. Stat. Ann. 5:5-128e.  "That property is taken by eminent domain and is transferred to a private party can still fall within the gambit of public use."  Hughes v. Consol-Pennsylvania Coal Co., 945 F.2d 594, 612 (3d Cir. 1991).  "[T]he Supreme Court has also held that the fact that a taking creates incidental benefits for individual private parties 'does not condemn that taking as having only a private purpose.'"  Carole Media LLC v. N.J. Transit Co., 550 F.3d 302, 310 (3d Cir.

2008) (quoting <u>Hawaii Housing Authority v. Midkiff</u>, 467 U.S. 229, 243-44 (1984)).  Here, in negotiating horse track lease agreements, the State wanted to be able to provide economic incentives to the horsemen's organization, including the prospect of income from off-track wagering facilities and Pilot Program electric wagering terminals.  Wagering facilities and terminals will produce additional income, increase purse sizes, and promote interest in horse racing, all of which would assist the horsemen's organizations attain financial stability and strengthen New Jersey's horse racing industry.  The fact that a horsemen's organization will receive the wagering facility licenses and enjoy the benefit thereof does not make the taking unconstitutional.

The Court is careful to ensure that the public's benefit is not merely incidental to a private purpose.  In particular, forfeiture of Plaintiffs' licenses would greatly assist in financially stabilizing the owners and breeders of the horses that race in New Jersey.  <u>See</u> <u>Carole Media LLC</u>, 550 F.3d at 309 ("[T]he state may not take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit.") (citation omitted).  However, "[t]he role of the judiciary in determining whether [the takings] power is being exercised for a public purpose is an extremely narrow one," <u>Berman v. Parker</u>, 348 U.S. 26, 32 (1954), and the Court is satisfied at this stage that the State's interest in reinvigorating the horse racing industry is not a pretextual public use.  Consequently, it is unlikely that Plaintiffs will be able to demonstrate that the State lacks a public use in taking the wagering facility licenses.

Even so, the Plaintiffs are likely to succeed on this claim because the Deposit and Forfeiture Amendments do not provide compensation.  "The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation."  <u>Williamson County Reg'l Planning Comm'n v. Hamilton Bank</u>, 473 U.S. 172, 194 (1985).  "[T]here must be

20

at the time of taking reasonable, certain and adequate provision for obtaining compensation.

Reg'l Rail Reorganization Act Cases, 419 U.S. 102, 124-125 (1974) (quotation and citation

omitted).  But neither the Forfeiture nor the Deposit Amendments provide any procedure for

obtaining compensation, and therefore, should Plaintiffs be required to forfeit their wagering

facility licenses, they are likely to succeed in proving an unconstitutional taking.

### 3.   Equal Protection and Substantive Due Process

The Fourteenth Amendment provides that no State shall "deprive any person of life,

liberty, or property, without due process of law; nor deny to any person within its jurisdiction the

equal protection of the laws."  U.S. Const., Amend. XIV.  The first part of this guarantee, the

Due Process Clause, has a "substantive" component that bars certain arbitrary, wrongful

government actions."  Foucha v. Louisiana, 504 U.S. 71, 80 (1992).  The second part, the Equal

Protection Clause, "secure[s] every person within the State's jurisdiction against intentional and

arbitrary discrimination, whether occasioned by express terms of a statute or by its improper

execution through duly constituted agents."  Village of Willowbrook v. Olech, 528 U.S. 562, 564

(2000) (quoting Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 445 (1923)).  In other

words, the Equal Protection Clause prevents the State "from treating differently persons who are

in all relevant respects alike."  Nordinger v. Hahn, 505 U.S. 1, 10 (1992).

In this case, to survive substantive due process and equal protection challenges, the

amendments to the Act must be rationally related to a legitimate state interest.  See Williamson

v. Lee Optical, 348 U.S. 483 (1955) (rational basis review applied to regulations affecting

business or industry that are challenged on substantive due process ground); City of Cleburne v.

Cleburne Living Ctr., 473 U.S. 432, 440 (1985) (rational basis review applied to social and

economic legislation challenged on equal protection ground).

In this case, the Legislature identified a broad economic purpose in passing the Act: "The horse racing industry is economically important to this State, and the general welfare of the people of the State will be promoted by the advancement of horse racing and related projects and facilities in the State."  N.J. Stat. Ann. 5:5-128a.  Even if a wagering facility is "an essentially private business function," id. 5:5-128e, the Act nevertheless authorized wagering facilities to advance the broader legislative purpose.  Specifically, wagering facilities and the Pilot Program electronic wagering terminals increase commerce, employment, recreation, and revive the quality of the economically important horse racing industry.  The Court finds these objectives to be legitimate, and the Court "is not entitled to second guess the legislature on the factual assumptions or policy considerations underlying the same."  Sammon v. N.J. Bd. of Med. Examiners, 66 F.3d 639, 645 (3d Cir. 1995).

By "incentivizing" Plaintiffs to establish their wagering facilities, the Forfeiture and Deposit Amendments accomplish the goals of protecting and advancing the horse racing industry.  Additionally, in allowing only the lessees of the Meadowlands and Monmouth horse tracks to establish electronic wagering terminals, the Pilot Program Act facilitates the development of self-sustaining horse racing industry, which benefits the State's economy.  As such, the amendments to the Act advance a legitimate State purpose, and, therefore, Plaintiffs are not likely to succeed in demonstrating their substantive due process and equal protection claims.

### B.    Irreparable Harm

Continuing the preliminary injunction analysis, the Court next considers whether "denial will result in irreparable harm to the plaintiff" and whether "granting the injunction will not result in irreparable harm to the defendant."  NutraSweet, 176 F.3d at 153 (citations omitted).

In order for a preliminary injunction to be appropriate, the complained-of injury must be imminent and irreparable.  See Marxe v. Jackson, 833 F.2d 1121, 1128 (3d Cir. 1987).  It is not sufficient that Plaintiffs have demonstrated a likelihood of success on the merits.  See Morton v. Beyer, 822 F.2d 364, 371 (3d Cir. 1987).  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."  Sampson v. Murray, 415 U.S. 61, 90 (1974).  Moreover, a preliminary injunction is not appropriate where the harm is speculative and contingent upon future events.  See, e.g., O'Shea v. Littleton, 414 U.S. 488, 493-495 (1974).  "It must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct."  Id. at 494 (quoting Massachusetts v. Mellon, 262 U.S. 447, 488 (1923)).

Defendant asks the Court to deny the Motion for Preliminary Injunction because the Commission will not be enforcing the Forfeiture or Deposit Amendments for at least a year.  Defendant thus argues that the application for a preliminary injunction is premature.  In light of the Commission's approval of Plaintiffs' progress petitions, the harm caused by the forfeiture or deposit requirements would not occur until a year from now at the earliest.  In addition, the regulations necessary to effectuate the Pilot Program Act are still in a notice and comment period.  Thus, the Commission cannot implement the Pilot Program Act until later this year.

The amendments to the Act have not yet been applied so as to cause substantial interference with Plaintiffs' contract rights.  See e.g., Armstrong, 961 F.2d at 413-24.  In addition, a plaintiff ordinarily cannot claim that the Takings Clause has been violated until after the plaintiff has sought compensation from the State.  See, e.g., Williamson County Reg'l Planning Comm'n, 473 U.S. at 191-95.  To enter a preliminary injunction now would result in a

"premature adjudication that duly enacted Legislation is unconstitutional." NUI Corp. v.

Kimmelman, 765 F.2d 399, 402 (3d Cir. 1985).  Therefore, even though the Court finds this

action is ripe for judicial review due to Defendant's threat of enforcement should Plaintiffs fail to

comply with the making-progress provisions, a preliminary injunction is not appropriate.

Plaintiffs have not demonstrated immediate irreparable harm since deposit or forfeiture is at least

a year away, and sufficient relief will be available in the later stages of litigation.

C.     Public Interest

The final determination with respect to whether a party is entitled to preliminary

injunction is whether "granting the injunction is in the public interest." NutraSweet, 176 F.3d at

153.  The public interest in not served by entry of a preliminary injunction at this early stage of

the case.  In approving the amendments to the Act, the Legislature reinforced the need to support

the New Jersey horse racing industry.  See, e.g., 2011 N.J. Laws 26, § 1.  "The horse racing

industry is economically important to this State, and the general welfare of the people of the

State will be promoted by the advancement of the horse racing and related projects and facilities

in the State." Id.; N.J. Stat. Ann. 5:5-128a.  While it is true that wagering facilities are private

businesses, they support the horse racing industry by increasing commerce, employment,

recreation, and reinvigorating the quality of the sport in New Jersey. Id. § 1a-c.  Enjoining laws

designed to foster that development is not in the public interest, especially given that Plaintiffs'

injury is speculative and contingent upon events that may not occur or at least will not take place

right away.

As a final thought, the Court believes that a protracted dispute over the amendments to

the Off-Track and Account Wagering Act could be avoided.  When the Legislature passed the

Off-Track and Account Wagering Act, it envisioned a statewide network of wagering facilities

that would offer recreation and quality dining, and that simultaneously would promote superior quality horse racing in New Jersey.  What it got was a horse of a different color.  Only three wagering facilities are open, the horsemen's organizations are in financial trouble, and the New Jersey horse racing industry is ailing.  Therefore, it appears that the public interest is best served if the parties come to some global resolution as to how to ensure a stable economic future for New Jersey's horse racing industry.  This might involve, for example, exploring the market need for additional wagering facilities and determining how the various participants in the industry (i.e., the State, horse track owners, and horsemen's organizations) can best carry out a plan to establish the ideal number of wagering facilities.  Such a plan could maximize profits, increase consumer interest in horse racing, and enhance the quality of horse racing, thereby achieving the purposes of the Act.

## V.      CONCLUSION

     For the reasons above, the Court denies Plaintiffs' Motion for a Preliminary Injunction without prejudice. An appropriate order is filed herewith.

Dated:  July 11, 2012

/s/ JOEL A. PISANO           
United States District Judge
